IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **AMERICAN FARM BUREAU FEDERATION,** *et al.,* | : | **CIVIL NO. 1:11-CV-0067** |
| **Plaintiffs** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,** *et al.,* | : | **Judge Sylvia H. Rambo** |
| **Defendants** | : | |

# M E M O R A N D U M

Presently before the court are three motions for leave to intervene. The proposed intervenors seek leave to intervene in this action as party defendants as a matter of right under Federal Rule of Civil Procedure 24(a)(2), or, in the alternative, for permissive intervention under Federal Rule of Civil Procedure 24(b)(1). For the reasons set forth below, the motions will be granted.


## I.        Background

Plaintiffs in this case are seeking declaratory and injunctive relief against Defendant, the United States Environmental Protection Agency ("EPA"). Plaintiffs ask the court to vacate the Total Maximum Daily Load ("TMLD") established by EPA for the Chesapeake Bay and its tributaries. Although not directly relevant to the intervention motions presently pending, some contextual background is helpful to understand the posture and the nature of the issues involved in the underlying case.

The Clean Water Act ("CWA") seeks "to restore and maintain the chemical, physical and biological integrity of the Nation's waters."  33 U.S.C. § 1251(a).  To achieve this, Congress granted EPA authority to, among other things, develop effluent discharge standards, 33 U.S.C. § 1311, water quality standards, 33 U.S.C. § 1313, and limit pollution discharges from point sources through a permitting scheme called the National Pollutant Discharge Elimination System ("NPDES"), 33 U.S.C § 1342.  This case implicates, primarily, the water quality standard sections of the CWA.  33 U.S.C. § 1313

"Water quality standards" are regulations comprised of: 1) a description of the designated use or uses of a water body; 2) the criteria necessary to protect the use or uses; and 3) a statement by the applicable state that the standard will maintain and protect the existing use and the water quality of the water body.  40 C.F.R. § 131.6.  These state standards are then subject to EPA review.  33 U.S.C. § 1313(c).  To establish effluent limitations, the EPA may promulgate technology-based effluent limits.  33 U.S.C. § 1312.  When these efforts have proven insufficient to remove water quality impairments, a TMDL must be established.  33 U.S.C. § 1313(d); 40 C.F.R. § 130.7.  A TMDL is, in essence, a pollution budget, and it represents a calculation of the maximum amount of a pollutant that a water body can receive and still meet water quality standards.  A TMDL represents the sum of point source waste allocations, non-point source load allocations, and natural background sources of pollutants.  40 C.F.R. § 130.2(I).  Thus, a TMDL assigns allocations to farms, cities, businesses, as well as residential and undeveloped lands.  Although a TMDL itself is only informational in nature, each state in the Chesapeake Bay watershed

must develop an implementation plan to describe how they will achieve their respective allocations under the TMDL.  33 U.S.C. § 1313.

Efforts to reduce the amount of pollution entering the Bay from the Chesapeake Bay watershed  – which includes Virginia, Maryland, Pennsylvania, New York, Delaware, West Virginia, and the District of Columbia, (collectively, "Bay Jurisdictions") – have been ongoing for more than thirty years.  More recently, in May 2009, President Obama issued executive order 13508, which required seven federal agencies, led by the Administrator of the EPA and in consultation with Bay Jurisdictions, to develop a strategy for addressing Bay pollution and preserving Bay natural resources.  On May 10, 2010, an agreement was signed by Jon A. Mueller, Vice President for Litigation for the Chesapeake Bay Foundation, and a representative of the EPA.  (CBF Memo in Supp. of Mot. to Intervene, Doc. 52-1, Exh. A.)  Some of the proposed intervenors argue that this agreement effectively settled  *Fowler v. EPA*, No. 1:09-CV-00005-CKK (D.D.C. May 11, 2009), although Plaintiffs apparently dispute this fact.  Regardless, the agreement states that "By December 31, 2010, pursuant to 33 U.S.C. §§ 1313(d) and 1267, EPA will establish the Bay TMDL."  *Id.*  On May 12, 2010, a final strategy was issued requiring EPA to develop a Bay TMDL with full implementation required by 2025.  Using model simulations, the 2010 TMDL promulgated allocations of 185.9 million pounds per year (mpy) of nitrogen, 12.5 mpy of phosphorus, and 6.45 billion pounds per year of sediment among the above-mentioned Bay Jurisdictions.  Plaintiffs here are challenging the validity of this TMDL.

**II.**        **Procedural History**

Plaintiffs filed a complaint on January 10, 2011 (Doc. 1) and EPA filed an answer on March 14, 2011 (Doc. 15).  On April 4, 2011, Plaintiffs filed an amended complaint (Doc. 16) to which EPA filed an answer on April 21, 2011 (Doc. 23).  The amended complaint alleges that EPA violated the CWA and the Administrative Procedures Act ("APA") by issuing the 2010 TMDL for the Chesapeake Bay and its tributaries.  Plaintiffs assert that EPA lacked authority under the CWA to issue the TMDL; the TMDL was arbitrary and capricious; EPA failed to provided adequate public notice and comment on the TMDL; and the TMDL is *ultra vires*.  The Plaintiffs request that the court vacate the TMDL.

Three motions for leave to intervene have been filed.  On May 25, 2011, a joint motion was filed by the Chesapeake Bay Foundation, Inc., Citizens for Pennsylvania's Future, Defenders of Wildlife, Jefferson County Public Service District, Midshore Riverkeeper Conservancy, and the National Wildlife Federation (collectively, the "CBF Group").  (Doc. 25.)  A brief in support was filed on June 3, 2011.  (Doc. 52.)  A second joint motion and brief was filed on May 25, 2011, by several municipal clean water associations including the National Associations of Clean Water Agencies ("NACWA"), Maryland Association of Municipal Wastewater Agencies, Inc. ("MAMWA"), and the Virginia Association of Municipal Wastewater Agencies, Inc. ("VAMWA") (collectively, the "Municipal Associations Group").  (Docs. 27 & 29.)  Plaintiffs filed a consolidated response on June 20, 2011. (Doc. 57.)  Reply briefs were filed by the Municipal Associations Group (Doc. 66) and the CBF Group (Doc. 67) on July 5 and July 7, 2011, respectively.  A third motion (Doc. 59) and supporting brief (Doc. 61) was filed on June 27, 2011, by the

4

Pennsylvania Municipal Authorities Association ("PMAA").  Plaintiffs filed a brief in opposition on July 14, 2011, (Doc. 68), to which a reply brief was filed on July 28, 2011 (Doc. 70).  Defendant EPA has not taken a position with regard to the motions. Accordingly, all three motions are ripe for disposition.

## III.        The Proposed Intervenors[1]

### A.        The Municipal Associations Group

#### 1. NACWA

NACWA is a voluntary, non-profit national trade association representing the interests of the nation's publicly owned wastewater and stormwater utilities.  NACWA's members include nearly 300 of the nation's municipal clean water agencies, including nearly twenty within the Chesapeake Bay watershed. These agencies own and operate wastewater treatment plants ("WWTPs") to which allocations have been granted under the TMDL.  NACWA has led efforts to implement environmental programs geared toward protecting the health of the public and natural ecosystems.

#### 2. MAMWA

MAMWA is a non-profit, non-stock corporation incorporated under the laws of Maryland that represents the owners and operators of WWTPs throughout Maryland.  MAMWA's members discharge treated wastewater into the Bay, or its tributaries, pursuant to NPDES permits issued by the state of Maryland and have received allocations for their discharge under the Bay TMDL.  Since 1996,

---

[1]  The descriptions of the various proposed intervenors are taken directly from the parties' respective motions. It is assumed that, consistent with Federal Rule of Civil Procedure 11, these representations are accurate.

MAMWA has worked to reduce and eliminate water pollution through the application of science and policy.

### 3. VAMWA

VAMWA is a non-profit, non-stock corporation incorporated under the laws of Virginia that represents fifty-seven local governments, wastewater authorities, and districts that own and operate WWTPs throughout Virginia. Most of VAMWA's members' facilities discharge treated wastewater into the Bay or its tributaries pursuant to state-issued NPDES permits. VAMWA has assisted members in efforts to protect public health and the environment through science and policy.

### B.   PMAA

PMAA is an association that represents 720 sewer and water authorities in Pennsylvania. PMAA assists water and sewer authorities in providing services that protect and enhance the environment and promote economic growth. The Pennsylvania Department of Environmental Protection ("DEP") adopted the Pennsylvania Chesapeake Bay Tributary Strategy, which identified more than 180 WWTPs in Pennsylvania that would have to implement certain nutrient reduction measures in order to address water quality issues in the Chesapeake Bay. Nearly half of the 180 WWTPs are owned or operated by municipal authorities represented by the government relations efforts of PMAA. Additionally, PMAA was an active member of the DEP Stakeholders Group on the Chesapeake Bay Tributary Strategy and continues to be actively involved in several work groups convened by DEP regarding implementation of the Bay TMDL in Pennsylvania.

C. __The CBF Group__

 1. __The Chesapeake Bay Foundation, Inc. ("CBF")__

  CBF is a non-profit corporation based in Annapolis, Maryland.  CBF is dedicated to restoring and protecting the Chesapeake Bay and its tributaries.  With over 235,800 members, CBF engages in various programs and activities designed to promote water quality awareness and reduce pollution.  To that end, CBF has been involved in numerous meetings with stakeholders and EPA regarding the development of the Bay TMDL.  CBF also submitted comments on the draft Bay TMDL.  CBF was a party to *Fowler v. EPA*, No. 1:09-C-00005-CKK (D.D.C.), a matter that CBF claims was settled pursuant to an agreement that required, among other things, the development of a Bay-wide TMDL by December 31, 2010.

 2. __Citizens for Pennsylvania's Future ("PennFuture")__

  PennFuture is a statewide public interest membership organization that advocates for public policy to restore and protect the environment and safeguard public health.  Advocating for state and federal laws and regulations seeking to restore and protect the Bay has been a significant focus of the group.  As a member of the Choose Clean Water Coalition, PennFuture commented on the draft Bay TMDL.  PennFuture's members use the Susquehanna River and its tributaries for recreational purposes, including kayaking, fishing, swimming and snorkeling.

 3. __Defenders of Wildlife ("Defenders")__

  Defenders is a non-profit public interest conservation organization with more than one million members and supporters nationally, including 46,000 in Pennsylvania, 21,000 in Maryland, and 24,000 in Virginia.  Defenders works to protect all wild animals and plants in their natural communities and, as part of those

efforts, assists land trusts in the Chesapeake Bay watershed in conservation and biodiversity efforts.  Members regularly use the Bay and its tributaries for scientific research geared toward protecting wildlife; recreational activities including boating, canoeing, and kayaking; and to enjoy the natural environment and native wildlife. Defenders provided public comment during the development of the TMDL and also advocated on behalf of the TMDL.

### 4.  Jefferson County Public Service District ("JCPSD")

JCPSD is a duly created public service district under W.Va. Code 16-13A-1, *et seq.* that provides sanitary sewer collection services in Jefferson County, West Virginia.  JCPSD serves approximately 1,900 customers.

### 5.  Midshore Riverkeeper Conservancy ("Midshore")

Midshore is a non-profit organization dedicated to restoring and protecting the rivers of Maryland's Eastern Shore, including the Choptank River, the Miles River, the Wye and Wye East Rivers, and Eastern Bay, all tributaries to the Chesapeake Bay.  Midshore has over 700 members, most of whom live on or near these waterways and use them for recreational activities including boating, swimming, crabbing, fishing, bird watching, and hunting.

### 6.  National Wildlife Federation ("NWF")

NWF is the nation's largest conservation education and advocacy organization.  NWF engages in nation-wide efforts to protect wildlife and has more than four million members as well as forty-five state and territory-level affiliate organizations, including affiliates in Delaware, the District of Columbia, New York, Pennsylvania, Virginia and West Virginia.  NWF has three primary missions: confronting global warming, protecting and restoring wildlife, and connecting people

8

with nature.  NWF has approximately 250,000 members in the Chesapeake basin and the District of Columbia.  NWF seeks to improve the water quality in the Bay watershed through its grassroots efforts.  NWF submitted comments during the TMDL drafting process.

## IV.      Standard

Rule 24 of the Federal Rules of Civil Procedure governs intervention in an existing lawsuit. A movant may intervene as of right under Rule 24(a) or if granted permission under Rule 24(b).  Rule 24(c) sets forth the procedural requirements for intervention.

Rule 24(a)(2) provides that "[o]n timely motion, the court must permit anyone to intervene who . . . claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest." FED. R. CIV. P. 24(a)(2).

The Third Circuit has held that to intervene as of right under Rule 24(a)(2), a movant must establish the following four factors: 1) a timely application for leave to intervene, 2) a sufficient interest in the underlying litigation, 3) a threat that the interest will be impaired or affected by the disposition of the underlying action, and 4) that the existing parties to the action do not adequately represent the prospective intervenor's interests. *Liberty Mut. Ins. Co. v. Treesdale, Inc*., 419 F.3d 216, 220 (3d Cir. 2005) (citing *Kleissler v. U.S. Forest Serv*., 157 F.3d 964, 969 (3d Cir. 1998)). The movant must satisfy all four requirements. *Id.* (quoting *Mountain Top Condo. Assoc. v. Dave Stabbert Master Builder, Inc.*, 72 F.3d 361, 366 (3d

Cir.1995)).  "To establish a sufficient interest for intervention, [Petitioner] must demonstrate an 'interest relating to the property or transaction which is the subject of the action.'"  *Liberty Mut.*, 419 F.3d at 220 (quoting *Mountain Top*, 72 F.3d at 366).

Rule 24(b)(1)(B) provides that "[o]n timely motion, the court may permit anyone to intervene who . . . has a claim or defense that shares with the main action a common question of law or fact."  FED. R. CIV. P. 24(b)(1)(B).  Rule 24(b)(3) provides that "[i]n exercising its discretion, the court must consider whether the intervention will unduly delay or prejudice the adjudication of the original parties' rights."  FED. R. CIV. P. 24(b)(3).

## V.         Discussion

### A.     Intervention as of Right

#### 1.  Timeliness

Rule 24(a) requires that in order to grant intervention as of right, the motion must be timely.  In making this determination, the court must consider "all the circumstances," including "(1) [h]ow far the proceedings have gone when the movant seeks to intervene, (2) the prejudice which resultant delay might cause other parties, and (3) the reason for the delay."  *Choike v. Slippery Rock Univ. of Pa.,* 297 F. App'x 138, 140 (3d Cir. 2008).  As noted by the Third Circuit, "the critical inquiry is: what proceedings of substance on the merits have occurred?" *Mountain Top*, 72 F.3d at 369.

Notably, Plaintiffs do not challenge the timeliness of the motions and the court does not independently find these motions to be otherwise untimely.  The lawsuit has not progressed to any proceeding of substance on the merits.  The

proposed intervenors filed their respective motions on May 25 and June 27, 2011, less than three months after the filing of the April 4, 2011 amended complaint.   At the time of these filings, the administrative record was not yet produced to the court. Thus, the court finds that the motions are timely and a grant of intervention will not cause prejudice or delay to the original parties.

## 2. <u>Legally Cognizable Interest</u>

A mere general interest in the subject matter of the litigation is not enough to constitute a protectable interest under Rule 24(a).  Rather, a proposed intervenor must demonstrate "that there is a tangible threat to a legally cognizable interest." *Mountain Top,* 72 F.3d at 366.  As the Third Circuit noted in *Kleissler*:

> [T]he polestar for evaluating a claim for intervention is always whether the proposed intervenor's interest is direct or remote.  Due regard for efficient conduct of the litigation requires that intervenors should have an interest that is specific to them, is capable of definition, and will be directly affected in a substantial concrete fashion by the relief sought.  The interest may not be remote or attenuated. The facts assume overwhelming importance in each decision.

157 F.3d at 972.

### a. <u>The Municipal Associations Group</u>

The Municipal Associations claim that they have a protectable interest in the outcome of this case because they have an interest in the amount of nutrients and sediment their members are authorized to discharge.  They further claim that their members discharge directly or immediately upstream of waters that are already listed for TMDL development and therefore the facilities and lands owned by their members are subject to the control strategy established by the TMDL.  Movants also contend that many of their members have recently completed, or are in the process of

completing, major capital investments in treatment upgrades to comply with allocations assigned to their WWTPs under the Bay TMDL.  They argue that Plaintiffs' challenge to the TMDL could affect their members' individual allocations, thus rendering their capital upgrades insufficient or obsolete.[2]

Other courts have found such interests to be sufficient to satisfy Rule 24(a) standards.  In *Sierra Club v. EPA*, the Ninth Circuit Court of Appeals reversed a district court ruling denying the City of Phoenix's motion to intervene as of right. 995 F.2d 1478 (9th Cir. 1993), *followed in relevant part, overruled on other grounds by The Wilderness Soc'y v. U.S. Forest Serv.*, 630 F.3d 1173 (9th Cir. 2011).  In that case, the Sierra Club sued the EPA seeking declaratory and injunctive relief that would require the EPA to change the terms of permits issued to the City pursuant to the Clean Water Act.  In conducting a Rule 24(a) analysis, the court found that the city had a legally protectable interest in the litigation.  Specifically, the court found that:

> The legitimate interests of persons discharging permissible quantities of pollutants pursuant to NPDES permits are explicitly protected by the [Clean Water] Act.  33 U.S.C. § 1342.  Because the Act protects the interest of a person who discharges pursuant to a permit, and the City of Phoenix owns such permits, the City has a "protectable" interest.  These permits may be modified by control strategies issued as a result of this litigation, so the City's protectable interest relates to this litigation.

---

[2]  In their response, Plaintiffs do not specifically argue that these Movants have no legally protectable interest relating to this action, but rather they argue that Movants lack an interest *that would be impaired by an adverse judgment.*  Although the court in *Kleissler* seemed to collapse the "interest" prong into the "impairment" prong, the court prefers to first establish whether or not a protectable interest exists, and then subsequently determine whether that interest will be impaired by an adverse ruling.  Thus, the court will address Plaintiffs' arguments regarding "impairment" more fully below.

*Id.* at 1485-86. Likewise here, the Municipal Associations' members discharge nutrients and sediment pursuant to their NPDES permit limits which are subject to the strategy established by the Bay TMDL. Thus, the court finds that Movants' interest in the amount of nutrients and sediment their members are authorized to discharge, which are governed by permits that may be amended as a result of this litigation, constitutes a legally protectable interest.

The court may also consider, and in this case acknowledges, the Movants' economic interests in the outcome of this case. *See Kleissler*, 157 F.3d at 973 (granting intervention in suit seeking injunction to halt all logging activity, finding movants' economic interest in future timber contracts represented a "strong" and "direct" economic interest in the outcome of the litigation); *Sierra Club v. EPA*, No. H-97-3838 (D. Md. Jan. 20, 1998) (Memorandum and Order granting MAMWA's motion to intervene recognizing, *inter alia*, MAMWA's economic interest in suit alleging that the EPA failed to fulfill certain duties under the Clean Water Act and the Endangered Species Act) (citing *United States v. City of Niagra Falls*, 103 F.R.D. 164, 166 (W.D.N.Y. 1984)). The court finds that movants' economic interests of preserving their capital investments in treatment upgrades to be more than a "mere attenuated economic interest" because they may be directly affected by the outcome of this litigation. *Kleissler*, 157 F.3d at 973.

To summarize, the property that is the subject of this litigation is the Chesapeake Bay. The transaction that is the subject of this litigation is the Bay TMDL that establishes nutrient and sediment allocations for the Chesapeake Bay. Movants claim that they have an interest in the (1) continued discharge of nutrients and sediment into waters of the Chesapeake Bay watershed pursuant to state-issued

NPDES permits, and (2) their economic expenditures made in light of current TMDL allocations.  Certainly, these interests are sufficiently related to the property and transaction that are the subject of this action to support intervention as of right.

### b.  **PMAA**

PMAA seeks to intervene on nearly identical grounds as the Municipal Associations Group.  PMAA asserts that its members discharge into bodies of water that are upstream of waters that are listed for TMDL development and are subject to the limits imposed by the TMDL.  Like the Municipal Associations Group, PMAA relies on *Sierra Club v. EPA*, 995 F.2d 1478 (9th Cir. 1993), where the court found that discharging permissible levels of pollutants pursuant to an NPDES permit, which could be subject to future permit modifications as a result of litigation, was a legally protectable interest sufficient to allow the movant to intervene as of right.  PMAA argues that its members likewise have a protectable interest in the amount of nutrients and sediment that they are authorized to discharge.  For the same reasons noted above, the court finds that PMAA has a protectable interest sufficiently related to the subject of this action to support PMAA's intervention as of right.

### c.  **The CBF Group**

Members of the CBF Group assert that they have a significantly protectable interest in this litigation as a result of their interests in: (1) the restoration of natural resources; (2) protecting past and present efforts supporting the reduction of pollutant loads; (3) preserving the proper proportional allocation of pollution loads and control efforts between differing contributing sources; and (4) preserving the settlement agreement in *Fowler v. EPA*.  More specifically, CBF, PennFuture, Defenders, Midshore, and NWF all claim that their members use the waters of the

14

Bay and its tributaries for aesthetic and recreational purposes. They also claim that restoration and preservation of the Bay is a core objective of their respective organizations. CBF and PennFuture point to past legal efforts geared towards improving regulatory compliance and have also advocated for federal and state laws as well as regulations and polices seeking to protect and restore the Bay. CBF is particularly concerned about preserving the May 10, 2010 agreement between itself and EPA, which called for the creation of the Bay TMDL, and which CBF argues was part of a settlement agreement in the *Fowler* litigation. Further, these groups participate in numerous educational programs that focus on teaching Bay ecology and also participate in other restoration activities including shoreline protection projects, tree planting, and oyster cultivation and dispersal. CBF was also involved in several stakeholder meetings with EPA during the development of the TMDL and was an active participant on the technical committee that oversaw the development of the TMDL. CBF, PennFuture (as a member of the Choose Clean Water Coalition), Defenders, and NWF all submitted comments during the TMDL drafting process. Further, JCPSD, like members of the Municipal Association Group, claims it has an interest in preserving the TMDL allocations that dictate the amount of nutrients and sediment that they are authorized to discharge.

      The court's review of relevant case law finds these interests to be sufficient to satisfy the "interest" prong of Rule 24(a)(2). In *Sagebrush Rebellion, Inc. v. Watt*, 713 F.2d 525 (9th Cir. 1983), the Ninth Circuit held that the Audobon Society was entitled as a matter of right to intervene in an action challenging the legality of a measure which it had supported. The suit challenged the legality of actions taken by a former Secretary of Interior to create the Snake River Birds of

Prey National Conservation Area in Idaho.  The District Court denied intervention, finding that the Audubon Society's interest was insufficient because it had no interest in the land that was the subject matter of the lawsuit.  The Ninth Circuit reversed, finding that the Audobon Society's interest in protecting birds and other animals and their habitats was sufficient to warrant intervention as of right.  *Id.* at 528.

Other Courts of Appeals have held similarly.  In *Coalition of Arizona/New Mexico Counties for Stable Economic Growth v. Dep't of the Interior*, 100 F.3d 837 (10th Cir. 1996), the Tenth Circuit found that an individual who had studied and photographed the Spotted Owl had sufficient interest to intervene in a suit against the United States Fish and Wildlife Service challenging the Service's decision to protect the Owl under the Endangered Species Act.  The court found that the proposed intervenor's "involvement with the Owl in the wild and his persistent record of advocacy for its protection amounts to a direct and substantial interest . . . for the purpose of intervention as of right."  *Id.* at 841.  The court relied on the Supreme Court's statement in *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 562-63 (1992) asserting that "the desire to use or observe an animal species, even for purely esthetic purposes, is undeniably a cognizable interest for purposes of standing."[3]  *See also Utah Assoc. of Counties v. Clinton*, 255 F.3d 1246 (10th Cir. 2001) (granting

---

[3]  The Court in *Lujan* analyzed such interests in the context of Article III standing, which requires an "injury in fact," meaning an "invasion of a legally protected interest which is (a) concrete and particularized . . . and (b) actual or imminent, not conjectural or hypothetical."  If such interests satisfy Article III standing, then they also satisfy the "interest" prong of Rule 24(a), "because Article III standing requirements are more stringent that those for intervention under rule 24(a), [thus] the determination that [the applicants] have standing under Article III compels the conclusion that they have an adequate interest under the rule."  *Coalition*, 100 F.3d at 842 (quoting *Yniguez v. Arizona*, 939 F.2d 727, 735 (9th Cir. 1991)); *Utah Assoc. of Counties v. Clinton*, 255 F.3d 1246 (10th Cir. 2001) (same).

several environmental interest groups intervention as of right in action challenging a presidential proclamation establishing Grand Staircase Escalante National Monument, finding movants' interest in protecting public lands and assuring their continued integrity was sufficient to warrant intervention as of right); *Mausolf v. Babbitt*, 85 F.3d 1295 (8th Cir. 1996) (granting intervention to conservation groups in suit seeking to enjoin the enforcement of restrictions on snowmobiling in a national park, finding the conservation groups' interest in the park's well-being and efforts to protect that interest are sufficient for intervention as of right).  Numerous other courts have granted intervention as of right where the particular interests of a special interest group were threatened.[4]

Here, the subject of Plaintiffs' lawsuit is the Chesapeake Bay.  Like the intervenors in *Utah Association of Counties, Coalition of Arizona/New Mexico Counties,* and *Mausolf*, the proposed intervenors have an interest in efforts affecting the Bay, not only because the groups' individual members utilize the Bay and its

---

[4] *Hazardous Waste Treatment Council v. South Carolina (In re Sierra Club)*, 945 F.2d 776, 779 (4th Cir. 1991) (holding that an environmental organization that was a party to an administrative permit proceeding was entitled to intervene as a matter of right in an action challenging the constitutionality of a governing state regulation); *Washington State Bldg. & Constr. Trades Council v. Spellman*, 684 F.2d 627, 630 (9th Cir. 1982) (holding that "the public interest group that sponsored an initiative [to limit the amount of radioactive waste entering state] . . . was entitled to intervention as a matter of right under Rule 24(a)" in an action challenging the initiative); *Planned Parenthood v. Citizens for Cmty. Action*, 558 F.2d 861, 869 (8th Cir. 1977) (holding that a neighborhood association, whose "professed purpose . . . is to preserve property values and insure that abortion facilities do not affect the health, welfare and safety of citizens," was entitled to intervene in an action challenging the constitutionality of a local ordinance imposing a moratorium on the construction of abortion clinics); *N.Y. Public Interest Research Grp. v. Regents of the Univ.*, 516 F.2d 350, 351-52 (2d Cir. 1975) (holding that a pharmacists' organization and individual pharmacists had a right to intervene in an action brought by consumers to challenge a state regulation prohibiting the advertising of the price of prescription drugs); *South Dade Land Corp v. Sullivan*, 155 F.R.D. 694 (S.D. Fla. 1994) (granting intervention to public interest organizations whose members use and enjoy Everglades National Park in suit seeking to enjoin the federal and state defendants from continuing to operate a Park water project).

tributaries for recreational and aesthetic purposes, but also because such efforts go to the core mission of the groups.  Given their past legal, educational, and physical efforts geared toward protecting and restoring the Bay, and the personal use and enjoyment of the Bay by the groups' individual members, the court finds that these groups have demonstrated a legally protectable interest in the outcome of this case.

### 3.  Impairment of Interests

#### a.  The Municipal Associations Group and PMAA

In order to meet the requirements of Rule 24(a)(2), proposed intervenors must also demonstrate that their interest might become affected or impaired, as a practical matter, by the disposition of the action in their absence. *Mountain Top*, 72 F.3d at 368.  Here, both the Municipal Associations Group and PMAA believe that if Plaintiffs succeed in this litigation, resulting in lax or no standards for non-point sources, then a greater burden will fall on WWTPs to meet the TMDL total allocations.  In support, they argue that TMDLs are a "zero sum game" and that any relaxing of one source sector's assigned allocations will necessarily result in more stringent allocations by the remaining source sectors, unless the total maximum daily load is also increased.  Movants further assert that they already completed or are in the process of completing major capital investments for treatment upgrades, efforts which could be rendered obsolete if they are required to adhere to stricter standards.

Plaintiffs respond, arguing that none of these interest are germane to the narrow issues before the court, namely, (1) whether EPA exceeded its statutory authority by issuing the TMDL, and (2) whether EPA's modeling effort was arbitrary and its public participation process was inadequate.  Additionally, Plaintiffs argue that Movants' "burden shifting" argument is based on pure speculation, and further

notes that this litigation does not address or challenge specific load allocations; rather it challenges EPA's authority to assign *any* of the allocations.  Plaintiffs state that if they "are successful and the TMDL is vacated, the result of any new load allocations issued by states to any sector is not known." (Pls.' Cons. Br. In Opp., Doc. 57, 24 of 36.)

Plaintiffs' argument that resolution of the narrow legal issues will not adversely affect Movants' interests represents a misinterpretation of the standard. The Rule refers to impairment "as a practical matter." FED. R. CIV. P. 24(a)(2). Thus, the court is not limited to consequences of a strictly legal nature.  *Utah Assoc. of Counties,* 255 F.3d at 1253 (citing *Natural Res. Def. Council v. United States Nuclear Regulatory Comm'n*, 578 F.2d 1341, 1345 (10th Cir. 1978)).  "To satisfy this element of the intervention test, a would-be intervenor must show only that impairment of its substantial legal interest is *possible* if intervention is denied.  This burden is minimal."  *Id.* (quoting *Grutter v. Bollinger*, 188 F.3d 394, 399 (6th Cir. 1999)) (emphasis added).  Accordingly, the court is free to look at the realistic and practical consequences of a potential ruling, not just the affects of the resolution of narrowly-tailored legal issues.  *Dev. Fin. Corp. v. Alpha Housing & Health Care, Inc.*, 54 F.3d 156, 162 (3d Cir. 1995); *Harris v. Pernsley*, 820 F.2d 592, 601 (3d Cir. 1987) ("[Rule 24(a)] directs the courts to consider the practical consequences of the litigation in passing on an application to intervene as of right.")

Plaintiffs request that the court vacate the TMDL.  Thus, it is possible that all or parts of the TMDL will be vacated as a result of this litigation.  As Plaintiffs readily point out, such a result could have consequences such as amended load allocations issued by states, and the precise nature of these amended allocations

is not yet known.  Movants suggest that, given the zero-sum nature of TMDLs, a greater burden will shift to them to fulfill the load allocations in the TMDL if the standards applicable to the Plaintiffs are laxed or vacated.  Plaintiffs do not specifically deny this point, and, in arguing that such a result is speculative, tacitly concede that it is at least a possibility.  Accordingly, the court finds that the Municipal Associations Group and PMAA have satisfied their burden of showing that their interests may be impaired or affected by the practical consequences of the disposition of this action.

### b.  **The CBF Group**

The CBF Group argues that their interests could be impaired by an adverse ruling because CBF dedicates significant resources to educational and restoration programs seeking to improve the Bay's water quality.  CBF points out that it runs programs in Maryland, Pennsylvania, Virginia and the District of Columbia that enroll over 30,000 students to teach about the Bay watershed and water quality issues.  CBF also operates oyster restoration programs in Maryland and Virginia, and aquatic grass planting programs on the James and Potomac Rivers, tributaries to the Bay.  CBF also dedicates considerable resources, including over $18 million to help farmers install best management practices, to help with compliance and water quality issues.  CBF argues that the impetus for some of these programs will decrease if the TMDL is vacated.  CBF also believes that water quality will continue to decline, harming natural resources that are essential to their educational and restoration programs.  Lastly, CBF points out that vacating the TMDL would adversely impact the legal agreement between EPA and CBF requiring EPA to develop and administer a Bay-wide TMDL.  In addition, the interests of

PennFuture, Midshore, NWF and Defenders would also be affected because each group has taken specific action to protect and restore the Bay's water quality and each has members that use the Bay and its tributaries for recreational and aesthetic purposes.

Plaintiffs respond that such interests are nothing more that "a general interest in environmental regulation" that is insufficient to support intervention. (Doc. 57 at 26 of 36.)  Having already found that the CBF Group has established a legally protectable interest related to this case, the court can dismiss this argument. Plaintiffs also argue that the proposed intervenors misapprehend the nature of the relief, noting that this suit does not seek a result requiring increased pollution to the Bay or decreased environmental protection.  Here again, Plaintiffs frame the issues and potential consequences of this case too narrowly.  As stated, the court must consider not only the nature of the relief sought (e.g., to vacate the TMDL), but also the practical consequences of such a ruling.  *Dev. Fin. Corp., Inc.,* 54 F.3d at 162.  It is not unreasonable to conclude that granting the relief requested and vacating the TMDL could lead to further degradation of the Bay's water quality and impair the interests of the proposed intervenors.  As stated, courts have granted intervention as of right to public interest groups in actions challenging the legality of a measure which it had supported or in circumstances where the outcome of the litigation might affect the group's members' enjoyment of the resource.  *See Sagebrush Rebellion*, 713 F.2d at 528 (granting intervention to National Audobon Society finding the Society's interest in preserving birds and their habitats could be impaired in suit challenging the establishment of a conservation area); *South Dade Land Corp.*, 155 F.R.D. at 697 (granting intervention as of right to public interest group where suit

challenging water flow projects in Everglades National Park could jeopardize the group's members' use and enjoyment of the park.)

The court also disagrees with Plaintiffs' argument that there is no nexus between the *Fowler* settlement agreement and this litigation.  Plaintiffs argue, without much explanation, that the final TMDL was not the fruit of the *Fowler* litigation.  The basis for this claim appears to be that a TMDL draft was already underway at the time agreement was signed.  The court finds little relevance in this argument.  What is relevant is that the CBF and EPA signed an agreement requiring EPA not only to develop, but also *administer* a Bay-wide TMDL.  (*See Exh. A to Proposed Intervenors' Memo. in Supp.*, Doc. 52-1, ¶ III.A, 1-4 and ¶ III.B, 5-7.)  The present suit seeks to vacate that TMDL.  Thus, CBF's legal interest in preserving that agreement will be impaired by a ruling vacating the TMDL because the EPA will not be able to administer the TMDL as anticipated by the agreement.  Likewise, an adverse decision in this suit could jeopardize the interests of Defenders, NWF, PennFuture and Midshore in preserving habitat, protecting wildlife, and maintaining their members use and enjoyment of the Bay.[5]

### 4.  Inadequacy of Representation

As the Third Circuit noted in *Kleissler*, the burden of establishing inadequacy of representation by existing parties varies with each case.  157 F.3d at 972.  The *Kleissler* court held that:

---

[5]  Proposed Intervenor JCPSD, filing jointly with the CBF group, argues that it might be adversely impacted if the TMDL is vacated because it may be subjected to more stringent allocations. The court finds that, for same reasons as stated when addressing the motions of the Municipal Associations Group and PMAA, JCPSD has satisfied its burden of showing that its interests may be impaired or affected by the practical consequences of the disposition of this case.

> [a] government entity charged by law with representing
> national policy is presumed adequate for the task . . .
> particularly when the concerns of the proposed intervenor,
> e.g., a "public interest" group closely parallel those of the
> public agency.  In that circumstance, the "would-be
> intervenor [must make] a strong showing of inadequate
> representation." [B]ut the presumption notwithstanding,
> when an agency's views are necessarily colored by its view
> of the public welfare rather the more parochial views of a
> proposed intervenor whose interest is personal to it, the
> burden is comparatively light.

*Id.* (internal citations omitted)*; accord Conservation Law Found. v. Mosbacher*, 966 F.2d 39, 44 (1st Cir. 1992); *Mausolf*, 85 F.3d at 1303 ("when the proposed intervenors' concern is not a matter of 'sovereign interest,' there is no reason to think the government will represent it.")  Moreover, an intervenor need only show that representation *may* be inadequate, not that it is inadequate.  *See Trbovich v. United Mine Workers*, 404 U.S. 528, 538, n.10 (1972); *see also Kleissler*, 157 F.3d at 972 (citing *Conservation Law Found.*, 966 F.2d at 44).  "The possibility that the interests of the applicant and the parties may diverge 'need not be great' in order to satisfy the minimal burden."  *Utah Assoc. of Counties*, 255 F.3d at 1254.

Here, EPA is a governmental entity and thus the rebuttable presumption that EPA will adequately represent the proposed intervenors applies.  The CBF Group sets forth several arguments to demonstrate that EPA cannot adequately represent their interests.  For instance, that group asserts that (1) administrations change and EPA is subject to political pressures that may not align with the intervenors interests, (2) EPA must represent broad and potentially conflicting interests and therefore may not adequately represent their "specific, parochial interests," (3) EPA may not resolve this case through litigation, but in a manner more

harmful to Movants' interests, and (4) EPA may not appeal a decision adverse to Movants' interests.

Plaintiffs argue that EPA can adequately represent the proposed intervenors because they share a "general alignment of interest" in upholding the TMDL. Plaintiffs go on to address each assertion by the CBF Group and argue that each claim, by itself, is not enough to show inadequacy of representation. For example, Plaintiffs argue that Movants' argument that representation is inadequate because of the possibility of shifting political pressures or changes in administration is unpersuasive because it would naturally follow that any time the government is a party, such an argument could be lodged in support of intervention which would essentially eviscerate the inadequacy of representation prong of the test. Nevertheless, the Third Circuit has found this argument to be persuasive in support of intervention. *See Kleissler*, 157 F.3d at 973-74 (granting intervention in part because the court did not believe that it was "realistic to assume that the [United States Forest Service's] programs [would] remain static or unaffected by unanticipated policy shifts"). The court agrees that this argument, by itself, is not enough to find EPA's representation of proposed intervenors inadequate, but it is nevertheless a consideration that, in conjunction with the other arguments, supports intervention.

The CBF Group next asserts that the government can not adequately represent their "specific, parochial" interests. The CBF Group argues that they are groups with regional and local interests, including aesthetic, economic, educational, recreational, and resource interests that would be harmed by vacating the TMDL. Plaintiffs respond by noting that although EPA's interests may differ from those of

24

the proposed intervenors "as a general matter," (Doc. 57 at 19 of 36), their interests nevertheless coincide with regard to the legal issues to be determined by this lawsuit regarding the validity and sufficiency of the TMDL.

Here again, the court finds Movants' argument persuasive.  In *Kleissler*, the Third Circuit acknowledged that a government agency must represent "numerous complex and conflicting interests" and "the straightforward business interests asserted by intervenors here may become lost in the thicket of sometimes inconsistent governmental policies." *Kleissler*, 157 F.3d at 973-74; *see also Dimond v. District of Columbia*, 792 F.2d 179, 192-93 (D.C. Cir. 1986) (a governmental entity charged by law with representing the public interest of its citizens would be "shirking its duty" were it to advance the narrower interests of a private entity.) Here, the interests of numerous stakeholders are implicated by the Bay TMDL, as evidenced by the numerous groups presently seeking intervention.  Because the EPA represents the broad public interest, it must consider not only the interests of the public interests groups, but also the  possibly conflicting interests from agriculture, municipal stormwater associations, and land developers.  Proposed intervenors also point to past legal proceedings wherein CBF and others sued EPA for failing to comply with the CWA and other Chesapeake Bay Agreements as further evidence of potentially conflicting interests.  In a related argument, proposed intervenors argue that the incongruence of interests may lead EPA to settle or otherwise resolve this litigation in a matter unfavorable to their interests, or may dissuade EPA from appealing a decision that adversely affects Movants' interests.  As noted in *Kleissler*, such arguments can give a proposed intervenor "legitimate pause" when considering

its confidence in adequate representation by the government.  157 F.3d at 973 (citing *Curry v. U.S. Forest Serv.*, 988 F. Supp. 541 (W.D. Pa. 1997)).

When considering these arguments in the aggregate, the court finds that the CBF Group has satisfied their "comparatively light" burden of showing the possibility of inadequate representation.  The same holds true for the Municipal Associations Group and PMAA, who argue that they have specific economic interests related to capital upgrade costs and corresponding rate increases, as well as specific operational interests related to the possibility of more stringent discharge restrictions.  Much like the specific and parochial interests of the CBF Group, the court finds these narrow interests may conflict with EPA's broader interest of protecting the public welfare and thus EPA may not adequately represent their interests.  Based on the foregoing, the court finds that Movants have satisfied all the elements necessary to intervene as a matter of right in this case as Defendants.[6]

## B.    Permissive Intervention

Even if the Movants were not entitled to intervene as of right, the court is satisfied that permissive intervention would be warranted under Rule 24(b).  Permissive intervention under Rule 24(b)(2) is allowed on timely application "when an applicant's claim or defense and the main action have a question of law or fact in common."  FED. R. CIV. P. 24(b)(2).  In deciding whether to permit intervention

---

[6]  Movants assert that they need not show that they have Article III standing as a prerequisite for intervention as of right.  The court agrees.  Although the circuit courts are split on this issue, case law in the Third Circuit indicates that Article III standing is not a prerequisite for intervention as a matter of right. *See CSX Transp., Inc. v. City of Phila.*, 2005 U.S. Dist. LEXIS 14300, *5-6 (E.D. Pa. July 15, 2005) (noting that neither the Supreme Court nor the Third Circuit have indicated that Article III standing is a requisite to Rule 24 intervention and denying intervention without analyzing Article III standing).  In a recent opinion, the Third Circuit noted the circuit split on this issue, but once again declined to address the issue. *Am. Auto. Ins. Co. v. Murray*, 2011 U.S. App. LEXIS 18558, *12, n.4 (3d Cir. Sept. 7, 2011).

under Rule 24(b), "courts consider whether the proposed intervenors will add anything to the litigation."  *See Kitzmiller v. Dover Area Sch. Dist.*, 229 F.R.D. 463, 471 (M.D. Pa. 2005).  Here, Movants, as intervening Defendants, will argue in favor of the sufficiency and validity of the Chesapeake Bay TMDL pursuant to the CWA and APA.  These arguments are congruent with the legal issues implicated in the main action between Plaintiffs and EPA.  The court does not find that intervention will unduly delay the proceedings or prejudice the adjudication of the original parties' rights.  In fact, given the complexity and voluminous size of the administrative record, which includes scientific models, the court finds that the presence of the intervenors may serve to clarify issues and, perhaps, contribute to resolution of this matter.

## VI.        Conclusion

        For the foregoing reasons, the court will grant the proposed intervenors' motions for leave to intervene.  An appropriate order will issue.

                             s/Sylvia H. Rambo
                             United States District Judge

Dated:  October 13, 2011.

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **AMERICAN FARM BUREAU FEDERATION**, *et al.*, | : | **CIVIL NO. 1:11-CV-0067** |
| **Plaintiffs** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**, *et al.*, | : | **Judge Sylvia H. Rambo** |
| **Defendants** | : | |

## O R D E R

In accordance with the above memorandum, it is **HEREBY ORDERED** that:

a) the Joint Motion for Leave to Intervene as Defendants filed by the Chesapeake Bay Foundation, Citizens for Pennsylvania's Future, Defenders of Wildlife, Jefferson County Public Service District, Midshore Riverkeeper Conservancy, and National Wildlife Federation (Doc. 25); and

b) the Joint Motion for Leave to Intervene as Defendants filed by the National Association of Clean Water Agencies, the Maryland Association of Municipal Wastewater Agencies, Inc., and the Virginia Association of Municipal Wastewater Agencies, Inc. (Doc. 27); and

c) the Motion for Leave to Intervene as Defendant filed by the Pennsylvania Municipal Authorities Association (Doc. 59)  are **GRANTED.**  The clerk of court shall add each party to the docket and amend the caption accordingly.

1

It is **FURTHER ORDERED** that Intervening Defendants shall jointly file their cross-motions for summary judgment and briefs in support in the same manner as the present motions.  Individual briefing will not be permitted.  The deadlines for Intervening Defendants' cross-motions for summary judgment and supporting briefs will be set by further order of the court.

s/Sylvia H. Rambo
United States District Judge

Dated:  October 13, 2011.